JUDGE HELLERSTEIN

25 CV 09 637

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

FORSETI MEDIA, INC. and WEINBERGER
MEDIA INC.,

                                Plaintiffs,     :    Case No.

             v.

AUDIO CHUCK LLC,

                               Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### COMPLAINT

Plaintiffs, Forseti Media, Inc. and Weinberger Media Inc. (together, "Plaintiffs") by and for its Complaint against Defendant, Audio Chuck LLC ("Defendant") hereby alleges as follows:

### INTRODUCTION

1. This case involves creators being repeatedly taken advantage of by a large media company. Plaintiffs are the creators and hosts of Anatomy of Murder (the "Podcast"), a successful true crime podcast. Defendant is a media company created and helmed by Ashley Flowers and built from the success of her own true crime podcast, Crime Junkie.

2. The relationship between the parties started out well, the Podcast made a strong launch, supported by Defendant's successful promotion on Crime Junkie's feed. However, that relationship soon soured, due not only to a lack of general support post-launch, but a trail of accounting irregularities that Plaintiffs only began to discover because of a spreadsheet Defendant flashed onscreen during a Zoom call.

3. The first issue Plaintiffs noticed was that Defendant appeared to be dipping into joint funds to pay their agency fees, but that appears to be only the tip of the iceberg. By this

action, Plaintiffs allege that Defendant breached their contract by failing to pay Plaintiffs their rightful share of Defendant's exclusive advertising revenue deal with Sirius XM, an amount equating to millions of dollars.  The SiriusXM deal has benefited Defendant greatly, but Plaintiffs have never seen that benefit, and instead have been subject to all of the downside in the form of decreased revenue and restrictions on other forms of monetization.

4.      Plaintiffs also allege that Defendant breached the implied covenant of good faith and fair dealing, which accompanies all contracts in New York.  During the negotiation and ultimate execution of the parties' contract extension in October 2024, Defendant did not disclose that they were, at apparently the same time, renegotiating their agreement with SiriusXM (taking effect in January 2025), and then withheld material terms of that renegotiated deal which significantly reduced the Plaintiffs' revenue below the increased share they bargained for.  When Plaintiffs noticed the steep decline in revenue that followed—which, upon information and belief, Defendant knew would occur—Defendant attempted to hide this information, deflecting and providing alternate (ultimately false) explanations, until they were forced to admit that Plaintiffs' revenue decline was caused by the new terms of the renegotiated deal between Defendant and SiriusXM.

## THE PARTIES

5.      Weinberger Media Inc. is a New York corporation with its principal place of business in New York, New York.

6.      Forseti Media, Inc. is currently a Connecticut corporation with its principal place of business in Darien, Connecticut.  At the time Plaintiffs contracted with Defendant, Forseti Media, Inc. was a New York corporation.  It was merged into a new Connecticut entity in the summer of 2022.

7.      Audio Chuck LLC d/b/a Audiochuck is an Indiana Limited Liability Company with its principal place of business in Indianapolis, Indiana.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendant pursuant to New York's long-arm statute, C.P.L.R. § 302(a), and consistent with the Due Process Clause of the United States Constitution, because: (a) Defendant has sufficient minimum contacts with the State of New York; (b) Defendant transacted business within New York, contracted to supply goods and/or services in New York, and/or committed tortious acts within the State giving rise to the claims asserted herein; and (c) the acts and omissions giving rise to this dispute occurred in the Southern District of New York, and Defendant purposefully availed itself of the privilege of conducting business in New York, thereby invoking the benefits and protections of its laws.

9.      Specifically, Defendant entered into the Agreement with Plaintiffs, two New York entities.  The Agreement provides that it "will be construed and its performance enforced under the laws of the state of New York without giving effect to its conflict of law principles."  *See* Agreement ¶ 11.  Defendant also entered into an agreement with SiriusXM upon which Plaintiffs' claims are based.  Upon information and belief, SiriusXM is an entity with its principal place of business in New York.

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in the district.

**STATEMENT OF FACTS**

**Plaintiffs are Experienced Law Enforcement Officials and
Creators of a Popular True Crime Podcast**

12.     The Plaintiffs are experienced media companies run by Anna-Sigga Nicolazzi (Forseti Media, Inc.) and Scott Weinberger (Weinberger Media Inc.).

13.     Ms. Nicolazzi is a career homicide prosecutor with twenty-one years of experience at the Brooklyn District Attorney's Office, including sixteen of those years in the office's Homicide Bureau, where she last served as Chief of Trials.

14.     During her career, Ms. Nicolazzi specialized in murder cases, and worked on hundreds of investigations and tried well over fifty felonies, including multiple defendant, double-jury and other complex cases.  She is also: (1) the television host and co-executive producer of True Conviction, which ran for four seasons on Investigation Discovery; (2) executive producer and host of Wolf Entertainment's Law & Order: Criminal Justice System podcast, currently finishing its second season; and (3) has otherwise appeared widely as a legal analyst.  She also serves as faculty for Harvard Law School's Trial Advocacy Workshop course, and has done so for the last ten years.

15.     Mr. Weinberger spent nearly a decade in law enforcement in Florida, before making a career in media focused on crime.

16.     He is a three-time Emmy-award winning Investigative Journalist, previously at WNBC-TV and WCBS-TV in New York, and is currently CEO and Executive Producer at Weinberger Media Inc., which he founded in 2007 to create unique content, specializing in non-scripted television programming that brings viewers into the world of crime, investigations, police and the judicial system.

17.     Notably, he is the creator of On the Case with Paula Zahn, which is now celebrating its twenty-eighth season on Investigation Discovery and the producer of True Conviction, also on Investigation Discovery.

**The Podcast was Immediately Successful and Remains so Today**

18.     Plaintiffs drew on this experience to create Anatomy of Murder (the "Podcast"), a weekly true crime podcast, which they also host, utilizing their insight and experience to examine homicide cases and paths to justice for the victims.

19.     The Podcast debuted in October 2020 at the #1 spot on Apple Podcasts, the most notable metric in the industry, and stayed in that place for a week.

20.     Plaintiffs credit Defendant for a large scale launch which helped to push the Podcast to the top of the charts, particularly the promotion on Ms. Flowers' podcast, Crime Junkie, and other cross-promotion, which more quickly introduced listeners to the show.

21.     After this launch, the Podcast grew organically despite, as will be described below, an apparent lack of continued effort from Defendant.  In an email dated June 29, 2021, roughly a year after the Podcast's debut, Ms. Flowers acknowledged the growth in listener base and revenue, noting that the Podcast had shown "100% growth in revenue with almost little to no marketing budget."

22.     To date, Plaintiffs—who host the show and create and produce the Podcast episodes without assistance from Defendant—have released over 250 episodes of the Podcast, and are currently approaching 200 million downloads.   The Podcast is among the highest performing podcasts globally, a top-0.01% podcast, and which has a 4.7 star rating out of 5.0 on Apple Podcasts.

23.     It has also received critical acclaim.  In 2022, the Podcast was recognized by the Webbys, a well-regarded podcast award, receiving the People's Choice award in the Crime & Justice category.  That same year, Rolling Stone magazine named the Podcast one of the 25 best true crime podcasts of all time.  The Podcast has been listed by Amazon Music as one of their most listened to true crime podcasts, and this week's episode is #5 on Apple and the show itself is #10 in the true crime category.

24.     What sets the Podcast apart from competitors, and has garnered the above attention, is the sober tone and empathy that the hosts (Plaintiffs) bring—learned from their many years of experience with these cases—and their focus on making the victim the centerpiece of each episode.

25.     The following listener review, which is one of many, bears out the impact of Plaintiffs on the Podcast's audience: "Their combined background, experience and knowledge give the podcast such a unique perspective.  They focus on telling the stories of the victims and their loved ones in such a respectful way.  You can tell when they speak, they are speaking from their hearts.  Highly recommend this podcast. It's one of the best."  (July 15, 2025 Apple Podcast show comments).

**Defendant Enters and Then Quickly Breaches its Agreement with Plaintiffs**

26.     Defendant is an Indiana-based media company founded by Ashley Flowers, the creator of another true crime podcast, Crime Junkie.

27.     Although Ms. Flowers does not have a background in law enforcement, she is a true crime enthusiast, and started Crime Junkie with a friend.  It is undeniable that Crime Junkie has been a huge success and is commonly regarded as the #1 true crime podcast, and Ms. Flowers has parlayed that success into growing her company, the Defendant, into a major media

corporation.  It is now home to approximately twenty true crime podcasts, many created by third parties like the Plaintiffs.

28.    In April 2020, Plaintiffs entered into a revenue share agreement where Plaintiff would develop, produce and host the Podcast, and Defendant would perform distribution, promotion and marketing services, and sell advertising for the Podcast (the "Agreement" attached hereto as Exhibit A).  Under the Agreement, Defendant was also required to collect revenue related to the Podcast, and to pay the Plaintiffs a share of ██% of "Net Advertising Revenue"—defined as

████████████████████████████████████████████████████

████████████████████████    *See id.* at 3-4.[1]

29.    During negotiations of the Extension, Plaintiffs discovered that Defendant had been misappropriating funds by secretly deducting its talent agent's fees from the Net Advertising Revenue of the Podcast, and that these fees were not among the "costs" included in the Agreement. In other words, Defendant was paying their agent—whose agency also represented Plaintiffs— from money that was meant to be split with Plaintiffs rather than from their own portion.

30.    This practice only came to light during a Zoom call when Plaintiffs noted a line item for agency fees in a spreadsheet flashed onscreen.  For clarity, although certain deductions from revenue are allowed under the Agreement for things like distribution fees and verifiable hosting and marketing costs, the Agreement does not permit Defendant to deduct its agent's fees

---

[1] On October 9, 2024, the parties extended the Agreement (the "Extension").  A true and correct copy of the Extension is attached hereto as Exhibit B.  The Extension modified the revenue share language in name only.  It retroactively removed the term "Net Advertising Revenue" for the prior period, going back to the start of the Agreement, but the Plaintiffs continued to be entitled to a share of ██% of █████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████    *See id.* ¶ 9.

from revenue. When questioned about the payments, Defendant initially denied the practice. When confronted with another spreadsheet that Plaintiff had received listing the agency deductions, Defendant was left no choice but to admit the practice.

31. When Defendant's practice became known and they failed to convince Plaintiffs that the deduction was proper, Defendant agreed to repay Plaintiffs the monies it had deducted, and the Extension included their obligation to repay over $█,000 and clarified that Defendant was obligated to pay its agent and any other third parties. *See id.* at 4.

32. Although the partnership continued, this issue—and, in particular, Defendant's misappropriation of funds and failure to disclose their actions—sowed distrust. Plaintiffs have thus been concerned about Defendant's adherence to the terms of the Agreement and have repeatedly asked Defendant if there is anything else impacting plaintiff's revenue, historically, at present or in the future, that they have not been made aware of.

33. Unfortunately, upon information and belief, Plaintiff's concerns were valid. In October 2021, just one year after the parties entered into the Agreement, Defendant entered into an exclusive global advertising sales deal with SiriusXM that covered all Defendant's podcasts (the "SiriusXM Deal"), which happened to be negotiated by the same agency that was being paid out of Plaintiffs' pocket. For reasons that are outlined below, Plaintiffs have repeatedly requested to see a copy of the agreement or agreements related to this deal, at least the portions that pertain to the Podcast, but Defendants have refused to provide the document or any of the specifics about it. Accordingly, while Plaintiffs have not seen the underlying agreement, reports at the time valued the deal at $100 Million and, upon information and belief, the actual value appears to have been closer to, or over $200 Million.

34.    Importantly to the Agreement, the SiriusXM Deal was an exclusive global advertising sales deal with SiriusXM, meaning that SiriusXM handled advertising sales for Defendant's podcasts, including Plaintiffs' Podcast.  In exchange, SiriusXM paid Defendant revenue, which, upon information and belief, included a minimum guarantee (the "MG") or guaranteed payment, meaning that Defendant would receive a monthly or quarterly sum—likely in the millions—calculated by assuming that all of the podcasts in Defendant's network collectively hit a minimum number of impressions, and sometimes contingent on actually hitting that number, and could have been reduced going forward if Defendant did not hit those numbers. Upon information and belief, the Podcast's numbers were included in the MG, and, because the Podcast was, during the term of the SiriusXM deal, one of Defendant's top three weekly podcasts, it had a large impact on the size of that MG.  In essence, an MG acts as an advance against future revenue and provides financial security to the recipient.  The MG is paid to the recipient whether or not the actual revenue received is below that amount.

35.    Upon information and belief, the Podcast was a significant part of the valuation for the deal, including the MG, by both Defendant and SiriusXM, and was identified, including at pitches that led to the SiriusXM Deal, as Defendants' second most valuable property, behind only Crime Junkie.  The Podcast was particularly valuable because it was one of only two weekly podcasts that Defendant ran at the time, the other being Crime Junkie.  Weekly podcasts are the revenue drivers in podcasting because of the number of episodes that grows the back catalog. Assuming that the rumors of the deal's value at $200 Million are accurate, if the Podcast was even 10% of the overall valuation, its proportional share of the SiriusXM Deal would have been $20 Million.

9

36.     Upon information and belief, SiriusXM has made payments to Defendant pursuant to this agreement, including the MG.

37.     However, although the SiriusXM deal was an exclusive advertising sales deal, and, upon information and belief, one that relied on the property as part of the valuation for the deal and ultimately fed advertising into the Podcast—meaning that it was "exploitation" of the Podcast—Plaintiffs have never received any portion of the MG or otherwise seen any payment related to its proportional value to the SiriusXM Deal.

38.     Instead, and although Plaintiffs were told by both Defendant and SiriusXM that revenue was predicted to significantly increase because of the new partnership with SiriusXM, upwards to the tune of $▮ Million per year, advertising revenue actually paid to Plaintiffs for the Podcast went **down** significantly in January 2022 as SiriusXM took over.  For example, in December of 2021, the last month before the SiriusXM Deal took effect, the podcast's proportional share of ad sales revenue equaled $73,579.27.  In the first two months of the SiriusXM Deal, while Defendant was, upon information and belief, receiving millions as part of their MG, revenue paid to Plaintiffs for the Podcast went down to 24,962.54 in January 2022 (a 66% decrease) and 37,516.25 in February 2022 (a 49% decrease)—meaning that those two months together bring in significantly less than what the Podcast had made in the single month of December 2021.  This was despite the fact that downloads and impressions of the Podcast remained relatively steady.

**Defendant's Excuses Regarding this Revenue Downturn Prove False**

39.     When Plaintiffs began to raise questions about this decrease in their payments and about the SiriusXM Deal more broadly, Defendant attempted to avoid the issue and told Plaintiffs that revenue would soon increase once SiriusXM got up to speed.  When their payments did not rebound and Plaintiffs continued to press, Defendant unilaterally increased payments to Plaintiffs

10

by $▮▮▮ per month, structuring the payments as "advances" that would be recouped from later SiriusXM payments, which they continued to claim would soon increase and easily cover the total amount advanced.

40.     In addition to the dip in their payments, the deal between Defendant and SiriusXM has limited Plaintiffs' ability to monetize the Podcast in other ways.  In late 2021, Plaintiffs had been preparing to launch their own subscriber platform for fans, which Defendant was set to facilitate.  Following the SiriusXM Deal, Defendant informed the Plaintiffs that they were no longer permitted to have their own platform because SiriusXM had that exclusive right.  Upon information and belief, Crime Junkie was not subject to this same restriction, as it maintains its own subscription platform, which it calls its "fan club".

41.     SiriusXM advertisements were also permitted to air for free on the Podcast, which was apparently a provision of the deal, and one from which Plaintiffs saw no benefit.  While Defendant would have been compensated for these "free" ad spots as part of the MG payments and overall deal structure, Plaintiffs, who rely on ad revenue for their proportional share of the revenue split, and in fact as a major piece of their livelihoods, received no compensation for these spots.  Rather, as advertising space in a podcast is limited, they actually prevent Plaintiffs from running paid advertisements in their spot, thereby decreasing Plaintiff's advertising revenue.

42.     Plaintiffs continued to press for transparency as to how the Podcast was being impacted by this deal.  Upon information and belief, in response to these questions, on the Friday before Christmas in 2022, Defendant unilaterally decided to abruptly stop the $▮▮▮ "advance" payments (even though the Podcast was still making considerably less than had been forecasted or then had been assured) and told Plaintiffs it intended to seek repayment for these amounts and would set up a repayment structure for Defendants to recoup the advances.

43.     Ultimately, Defendant offered to forgive the advanced monies, but only if Plaintiffs would agree to extend the Agreement—which was scheduled to expire in October—for an additional fourteen-and-a-half months.  Under the Agreement, Defendant owned the intellectual property associated with the Podcast and would keep it after the term of the Agreement expired.  Given that Plaintiffs wanted to continue the Podcast, which they created and which was their livelihood, they decided to agree to the Extension.  Upon information and belief, Defendant wanted to extend the Podcast because they were at the time renegotiating with SiriusXM and wanted to use the Podcast's numbers in that negotiation (or in new negotiations with a third party) to meet their download floor.

44.     The Extension offered Plaintiffs what they believed was additional value.  Under the Extension, Plaintiff's revenue share percentage increased to ██% for the new term, which began on October 15, 2024 and goes through December 31, 2025, which Plaintiffs expected would mean that their payments would significantly increase.  *See id.*

45.     As noted above, at the same time the Defendant was negotiating the Extension it was renegotiating the SiriusXM Deal, and, upon information and belief, needed the downloads or impressions of the Podcast in that renegotiation.  While Defendant did not tell Plaintiffs about this renegotiation, upon information and belief, that renegotiation gutted the increase in future payments that Plaintiffs had negotiated for in the Extension, which Defendant would have known in negotiating with Plaintiffs.

**Defendant's Most Recent Deception Comes to Light when Podcast Revenue Again Decreases in 2025 as a Result of the SiriusXM Deal**

46.     In January 2025, only a little more than two months after the Extension—and its ██ revenue share in Plaintiffs' benefit—went into effect, revenue payments by Defendant for

the Podcast again decreased dramatically.  When Plaintiffs raised this with Defendant, Defendant again made a number of shifting excuses.  Upon information and belief, these excuses were false.

47.     Defendant provided four different excuses over the span of a few weeks.  First, Defendant claimed that the decrease in paid revenues was due to a downturn in downloads for the Podcast, but the numbers did not support Defendant's excuse.  Second, they pivoted to saying that the first quarter is often slower for advertising sales, but this year was quite different and there was a much more drastic reduction than the first quarter of the year before.  Third, they claimed that this was a slump being felt across the industry.  Fourth, they changed that explanation again and said that shows were down across their network but that they did not know the cause.  Despite these issues, Defendant, who was in charge of marketing the Podcast, offered nothing in the way of a plan to combat this drop.  Defendant did, however, write to SiriusXM—in a March 28, 2025 email that Plaintiffs never saw a response to—to ask about the reduction in revenue.  However, when Plaintiffs went through actual numbers with Defendant's COO, he admitted that the revenue decrease was not in line with decreased downloads or lagging first quarter advertising sales.

48.     At this point, Plaintiffs pointedly asked whether anything about the SiriusXM Deal, including any advances that were paid or any changes, might have impacted revenue.  Defendants initially rebuffed their requests for information, but later reversed course.

49.     In an email dated April 15, 2025, Defendant's COO finally gave the actual reason for the decreased payments, admitting that the downturn was due to a restructuring in their deal with SiriusXM that went into effect January 1, 2025: "**Source of Revenue Reduction** - As of January 1, S[irius]XM adjusted their payment structure with ACN. Specifically, our compensation split increased towards S[irius]XM. This change, resulted in **a ██% reduction in the gross revenue we receive from S[irius]XM and is applied across our entire network**."

50.     In other words, while the parties were negotiating the Extension, which purported to increase the revenue split in Plaintiffs' favor by 30%, Plaintiffs' revenue actually went **down** because, at the same time, Defendant was secretly agreeing with SiriusXM to a change that would reduce all revenue ▮% across the board, negating the benefit that Plaintiffs had negotiated by the Extension.

51.     As they had in the past, Defendant tried to throw money at the problem, unilaterally stating that it would increase payments to Plaintiffs ▮%, ▮▮▮▮▮▮▮▮▮▮▮ to cover a shortfall and purportedly make Plaintiffs "whole", but, upon information and belief, this offer was aimed at deterring Plaintiffs from looking any more deeply at the SiriusXM Deal.

52.     Plaintiffs declined.  They instead asked again for transparency with respect to the SiriusXM Deal.  When Defendants, taking their time as Plaintiffs continued to see payments remain low and as they were approaching the end of the Extension period when they could potentially lose their rights in the Podcast, ultimately refused again to shed any light on that deal, this action followed.  Upon information and belief, while it was purporting to discuss this matter with Plaintiffs, Defendant was negotiating a new, lucrative deal for itself with RedSeat, which would have been based on its total network numbers—which would have again included downloads and impressions for the Podcast.

**Defendants Also Fail to Meaningfully Support the Podcast**

53.     In addition to the clear breach of the Agreement in Defendant's manipulation of the SiriusXM Deal, Defendants have, throughout the parties' relationship, failed to live up to their obligations under the Agreement or otherwise support the Podcast in ways that would have increased its value.

54.     While Plaintiffs have consistently put out a high quality product and otherwise performed all duties required of them under the Agreement, after the initial launch, Defendant has not promoted the Podcast in the same way as its own shows.

55.     Despite the quality of the Podcast and Defendant's obligations under the Agreement to provide marketing and advertising services, Plaintiffs have been disappointed by the lack of support and effort shown by Defendant.

56.     Defendant has failed to create merchandise for the Podcast, which is outlined in the Agreement (*see id.* at 5)—despite, upon information and belief, doing so for its other shows—has put only minimal design efforts into the website and social media assets for the Podcast—again, far below what it has done for other properties—and has generally failed to provide fulsome marketing support for the Podcast, instead leaving it to grow organically and by the product of Plaintiffs' efforts.

57.     Despite all of this, Plaintiffs have continued to comply with all of their obligations under the Agreement, and, week after week, to put out a high quality podcast that is beloved by true crime listeners.  However, upon information and belief, Defendant, a company that bills itself as pro-creator, has benefited off the backs of the plaintiff-creators, and actually denied them monies they were contractually owed, without contributing meaningfully in the ways the Agreement requires.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

58.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 through 57 as if fully set forth herein.

59.     On or about April 22, 2020, Plaintiffs and Defendant entered into a valid and enforceable contract whereby Defendant agreed, among other things, to pay Plaintiffs a ██% revenue share based on its exploitation of the Podcast.

60.     On or about October 9, 2024, Plaintiffs and Defendant entered into the Extension, amending the Agreement, including by increasing Plaintiff's revenue share to ██% for the period of October 15, 2024 to December 31, 2025.

61.     Plaintiffs fully performed all obligations required of them under the Agreement.

62.     Defendant breached the Agreement by failing to pay Plaintiffs, pursuant to the Revenue Share provision in the Agreement, the portion of the SiriusXM Deal attributable to the Podcast.

63.     As a direct and proximate result of Defendant's breach, Plaintiffs have sustained damages in an amount to be determined at trial, but believed to exceed $20 Million, exclusive of interest and costs.

64.     Plaintiffs have demanded payment and/or performance from Defendant, but Defendant has failed and refused to comply with its contractual obligations.

## SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

65.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 through 64 as if fully set forth herein.

66.     In addition to the express terms of the Agreement between Plaintiffs and Defendant, New York law implies a covenant of good faith and fair dealing in every contract.

67.     This implied covenant requires that neither party do anything to destroy or injure the right of the other party to receive the fruits of the contract.

68.     Plaintiffs have fully performed all of their obligations under the Agreement.

69.     Defendant, in bad faith and for improper motives, acted to deprive Plaintiff of the benefits of the Agreement, including by secretly renegotiating the SiriusXM Deal at the same time as Plaintiffs had negotiated for an increase in revenue share in the Extension, in a way that would negate Plaintiffs' bargained-for increase in their payments for the Podcast during the final term.

70.     Defendant's conduct, while perhaps not always violating an express provision of the Agreement, undermined the Agreement's purpose and frustrated Plaintiffs' legitimate contractual expectations.

71.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

   a.   Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

   b.   Awarding pre- and post-judgment interest as permitted by law; and

   c.   Grant such other and further relief as this Court deems just and proper.

Dated: November 13, 2025                    Respectfully submitted,

_____
Nicole Bergstrom
**PROSKAUER ROSE LLP**
11 Times Square
New York, New York 10036
Telephone: (212)969-3000
nbergstrom@proskauer.com

*Attorneys for Plaintiffs Forseti Media, Inc.*
*and Weinberger Media Inc.*